```
J9hdricc
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                New York, N.Y.

         v.                              13 Cr. 0356(RMB)

VAUGHN RICHMOND,

              Defendant.
------------------------------x

                                         September 17, 2019
                                         11:27 a.m.

Before:

              HON. RICHARD M. BERMAN,

                                         District Judge

                   APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MICHAEL NEFF
     Assistant United States Attorney

CHASE RUDDY
     Attorney for Defendant


        - also present -

United States Probation Department:

     P.O. LISA FARO, Southern District of New York
     P.O. ANA MARIA GONZALEZ, Eastern District of New York

J9hdricc

1          THE COURT:  How are you all?

2          Please be seated.  Sorry that I am a little late for
3  this hearing.

4          Let's start with the Probation Department.

5          P.O. GONZALEZ:  Good morning, your Honor.

6          THE COURT:  Good morning.

7          P.O. GONZALEZ:  So Mr. Richmond -- Ana Gonzalez from
8  the Eastern District New York Probation.  Mr. Richmond was
9  successfully terminated from treatment effective June 30th.  He
10 hasn't paid restitution since the last time we were here, which
11 was -- actually we were here on June --

12         THE COURT:  I hate to interrupt but you mean the
13 therapy?

14         P.O. GONZALEZ:  The therapy completed.

15         THE COURT:  Yes.

16         P.O. GONZALEZ:  So that's done.

17         THE COURT:  You were here the last time, no?

18         P.O. GONZALEZ:  Of course, yes.

19         THE COURT:  So it came up then, and we said that the
20 Court wanted to have the therapist's input before the
21 termination or conclusion.  Whatever happened to that?

22         P.O. GONZALEZ:  Oh, that was not my understanding.  I
23 apologize, your Honor.  My understanding was --

24         THE COURT:  It is not a question of understanding.  It
25 couldn't have been clearer.

1            Have you read the transcript from that last session?

2            P.O. GONZALEZ:  No, your Honor.

3            THE COURT:  No?

4            P.O. GONZALEZ:  No.  I have my own notes.

5            THE COURT:  You can't really go from your
6    recollection.  I bet you'll find that it is clear in the
7    transcript that before that happened -- Mr. Sapone had raised
8    the issue.

9            P.O. GONZALEZ:  Yes.

10           THE COURT:  And I said before that happens, I wanted
11   to hear from the therapists first.

12           I don't know.  Has there been a submission from the
13   therapist?

14           P.O. GONZALEZ:  Not that I am aware of.  Unless the
15   defense has something, I haven't --

16           THE COURT:  So I don't think your recollection,
17   respectfully, is correct as to what was determined on June 4,
18   2019, with respect to that.  But, anyway.

19           P.O. GONZALEZ:  So he was discharged on June 30th.

20           And the only other thing to update the Court on is the
21   fact that he hasn't paid restitution since May.

22           THE COURT:  Right.  So what did the therapist say upon
23   termination?

24           P.O. GONZALEZ:  That he had completed all treatment --

25           THE COURT:  Of course, otherwise you wouldn't have

J9hdricc

terminated. But there must be some substantive explanation of why --

P.O. GONZALEZ: It was very brief, actually. It was a very brief discharge summary. It just said that he met all the treatment goals.

THE COURT: So I have a problem generally with that, too, but in this case specifically that's what I would like to see.

P.O. GONZALEZ: You want the discharge summary?

THE COURT: No, because you are saying it is very brief and not informative. So if you look in the transcript, you'll see what I want from the therapist.

And, counsel, maybe you could help us secure that.

MR. NEFF: Certainly, your Honor. We will collectively make prompt efforts to get such a letter.

THE COURT: Yes. So I want to know from the therapist why he or she thought it was appropriate to terminate therapy. It is not a bad thing; it is a good thing if there is a good explanation, but I would like to understand the explanation.

P.O. GONZALEZ: So you want a letter from the therapist?

THE COURT: That is exactly what I want, unless you want to bring the therapist here -- that would be number one. But number two of course is always a letter from the therapist. Otherwise, how am I going to figure out what the therapist had

J9hdricc

1   in mind?
2           MR. NEFF:  Your Honor, just to hopefully preempt one
3   question.  I can foresee some therapists expressing --
4           THE COURT:  You are going to say "confidentiality."
5           MR. NEFF:  Yes.
6           THE COURT:  In a circumstance like this where the
7   Court is asking for it, there is no confidentiality issue.
8   Courts are entitled to have the therapist's input.
9           MR. NEFF:  Right, your Honor.
10          Are we permitted to convey to the therapist that any
11  such letter will not be on any public docket?
12          THE COURT:  If that's what you want, if that's what
13  she wants.  The therapist knows how to write a letter, right?
14  If they want it to be public is one thing, and if they want it
15  to be nonpublic it would be something else.
16          MR. NEFF:  It is simply in the interest of encouraging
17  them to feel they can write freely and, therefore, give the
18  Court more information.
19          THE COURT:  Yes.  Exactly.
20          MR. NEFF:  Thank you.
21          THE COURT:  Thank you very much.
22          When do you think you could get that?
23          P.O. GONZALEZ:  We could probably have it by the end
24  of this week.
25          THE COURT:  OK.  So that would be the 20th.  Great.

J9hdricc

         And just so there is no misunderstanding, I would like it as detailed as possible so I have an understanding of what was accomplished in therapy and why she feels -- does she feel, for example, that moving forward in life Mr. Richmond should or shouldn't have therapy continue?  Who knows?
         P.O. GONZALEZ:  OK.
         THE COURT:  Thank you.
         OK.  So anybody else want to cover anything?
         So there are, if I'm not mistaken, Probation Department specifications pending in this case.  No?
         P.O. GONZALEZ:  No.  They have been withdrawn.
         THE COURT:  They were withdrawn?
         P.O. GONZALEZ:  Mm-hmm.
         THE COURT:  Was that in January?
         P.O. GONZALEZ:  Yes.
         THE COURT:  OK.  All right.  And did you want to mention anything about working and living and how he is doing in those areas?
         P.O. GONZALEZ:  I don't have any information regarding his work.  Mr. Richmond failed to report to the office in August and did not come in at the beginning of this month either.
         I did go see him -- he moved to Queens.  I did go see him at the new address in Queens.  But he apparently through his attorney told the government today that he hasn't been paid

J9hdricc

1  since July and so --

2  THE COURT: He who?

3  P.O. GONZALEZ: Mr. Richmond hasn't received a salary
4  since July, allegedly. So that's all I would know. I don't
5  have any other information regarding his employment.

6  MR. NEFF: One note, your Honor, if I may?

7  It was just noted that there are not currently
8  specifications pending. As the Court may recall, I believe
9  termination is scheduled to -- I'm sorry, supervision is
10 scheduled to terminate at present on October 10th of this year.

11 THE COURT: Correct.

12 MR. NEFF: I did want to flag the possibility -- not a
13 guarantee, but the possibility of future specifications before
14 then if the restitution payments continue not to occur. That
15 is not what anybody wants. I think we all simply want
16 compliance and a smooth completion of this process. But I did
17 want to flag -- since the question of are there outstanding
18 specifications came up, I did want to flag at least that it is
19 possible that if the defendant remains not current in the
20 payments, there may be specifications filed before
21 October 10th.

22 If the payments -- if he can get current before then
23 and if everything else continues to go more or less smoothly,
24 it is my expectation there would be no more specifications and
25 there would be a smooth termination.

1    THE COURT:  And how much would he have to pay to be
2    current?
3    MR. NEFF:  Your Honor, he has paid through June but he
4    has not paid July, August or September as of this point.  So it
5    is $700 a month.  At present, that would be $2,100, and then
6    there also may be October, depending on when he pays, so that
7    would be 2,800.
8    THE COURT:  Have you all talked to him about that?
9    MR. NEFF:  Your Honor, I conferred with his counsel,
10   as Officer Gonzalez alluded to before this conference, and his
11   counsel relayed that there had been a death in the family
12   between the last conference and now, which led to funeral
13   expenses, as well as a lack of payment, as alluded to by
14   Officer Gonzalez.  But his counsel did mention that they
15   anticipate that he will be receiving funds between -- or in the
16   very near future, and, thus, I believe it is their anticipation
17   that he will be able to make certain payments shortly.
18   MR. RUDDY:  Thank you, your Honor.
19   Just to round things out a little bit, since the last
20   Court appearance on June 20th, Mr. Richmond's mother passed
21   away --
22   THE COURT:  Sorry to hear that.
23   MR. RUDDY:  -- which was an unfortunate loss for him
24   and certainly led to some unanticipated financial
25   considerations.

Case 1:13-cr-00356-RMB   Document 114   Filed 09/27/19   Page 9 of 17    9
J9hdricc

1         Additionally since then, his father is in declining
2    health and is in receipt of the 24/7 home care.  And so in part
3    because of these additional funeral and medical expenses that
4    were unanticipated, that's been a financial consideration that
5    has obviously weighed on Mr. Richmond, in addition to the fact
6    that he has not been paid since July 1st.  Now, we fully
7    anticipate and he has been told that his pay that he has not
8    received is going to be made current in the next few weeks.
9    There were, from what I understand, certain cash flow issues
10   with the business which prevented him from being paid but that
11   that should be remedied in the near future, and Mr. Richmond is
12   exploring other ways, including borrowing from people that he
13   is close to, to make current on his obligations.
14        I just want to make clear to the Court this is not
15   someone who is thumbing his nose at his obligations.  He is
16   desiring to be current and to be in accordance with his
17   obligations, and he's trying to do everything within his power
18   to do that, your Honor.
19        THE COURT:  So, do you have an understanding -- "you"
20   being the defense counsel and the government and probation --
21   as to what's going to happen?  I mean, there is this issue
22   floating around.  What is a doable proposition here?
23        MR. RUDDY:  So my understanding in my conversations
24   with Mr. Richmond is that he fully expects within the next
25   three weeks to be able to be fully current with his obligations

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   as to restitution, which I believe should obviate any need for
2   future specifications and hopefully allow us to transition to
3   the end of supervision in this case, your Honor.
4          THE COURT:  Mr. Richmond, how are things going from
5   your point of view?
6          THE DEFENDANT:  They've been quite stressful this
7   summer, in particular.  My mother's changing health has put a
8   lot of strain, and as a result the -- well, the insurance
9   coverages for my father in terms of nursing care has been
10  reduced.  The family has to now scramble to figure out coverage
11  for him.  He is starting to show increased evidence of early
12  onset dementia in terms of memory loss so he needs
13  round-the-clock care.  And to compound with that, start back of
14  school for my daughter.  It has been a very, very busy summer
15  in terms of the challenges coming, you know, one after the
16  other.
17         But on a more positive is the return of the business
18  professionals after the Labor Day holiday so now there is more
19  responsiveness and the feelings that there should be some
20  positive outcomes in the coming weeks.
21         THE COURT:  You are talking about work now, work-wise?
22         THE DEFENDANT:  That is the issues I have on
23  financial.
24         THE COURT:  Can you be a little more specific?  Is
25  work going well, and how do you measure that?

1    THE DEFENDANT: You know, I measure -- work is going
2 fine would be the word I would use. I would use the word well.
3 To use the word seasonably, that is close. So we rely on
4 positive response from counterparties, so whether it be the
5 business party on the other side saying, yes, they want to move
6 forward or any other party in relation to the business, this is
7 what we rely upon.
8    As of now, the last -- I would say the last ten days
9 we're seeing the activity pick up again and the responses being
10 very positive, and, you know, we're -- when I say "we,"
11 Malvasia and myself, because if nobody does well, they aren't
12 going to successfully compensate me we are waiting with bated
13 breath.
14    THE COURT: Any deals consummated?
15    THE DEFENDANT: We got the verbal commitment on Monday
16 morning on a property in Bellmore, so that hopefully will --
17 today. That was yesterday, so today the contract should be
18 submitted. And then that's one transaction I'm looking towards
19 that I think it will create the liquidity that will allow me
20 for my pay to be brought up.
21    THE COURT: Did you move to --
22    THE DEFENDANT: I am in St. Albans, Queens.
23    THE COURT: That's new?
24    THE DEFENDANT: That's occurred the end of May or the
25 beginning of June. It had to be the beginning of June. It was

J9hdricc

1  around the same time we had the last quarter.
2       THE COURT:  OK.
3       THE DEFENDANT:  It is temporary but it is where I am
4  now.
5       THE COURT:  Got it.  So, when you all come to the end
6  of supervision, how do you do that?  You just say, "Nice
7  talking to you, goodbye," or do you come up -- I know some
8  people help the person develop a plan that that person might
9  utilize, rely upon going forward even though there is no
10  probation in the picture anymore.  Do you do that, the latter?
11       P.O. GONZALEZ:  That obviously is the whole point of
12  the supervision process is to --
13       THE COURT:  I get that, but, you know, you would be
14  amazed how many times the whole point isn't accomplished.
15       P.O. GONZALEZ:  Well --
16       THE COURT:  So what is the point?  What is the whole
17  point?  Maybe I am not understanding you.
18       P.O. GONZALEZ:  The whole point of supervision is to
19  help offenders who are coming either out of prison or out of
20  court to lead successful, positive, productive lives, to set
21  them on a path, on a course where they will never come back
22  into these environs again.  Right?  So that is the whole idea.
23  From the very beginning, we start on that until the last day.
24       THE COURT:  Right.
25       P.O. GONZALEZ:  If the offender is not receptive to

1  it, then that is a different thing.  But that is the position
2  of the Probation Office.
3             THE COURT:  I get that.  Of course I understand that.
4             In this case what's going to happen?
5             P.O. GONZALEZ:  He's going to -- assuming he
6  terminates on October 10th, as scheduled, I mean --
7             THE COURT:  Nice talking to you, goodbye?
8             P.O. GONZALEZ:  Yeah.  There is nothing for him to
9  sign.  We close his file internally, and he would be making
10 payments on his own.
11            THE COURT:  So, again, I have the worry that I'm not
12 being clear again.  So, is there any advance planning for the
13 end of supervision that one shares with the person being
14 supervised?
15            P.O. GONZALEZ:  I'm not sure exactly what you're
16 asking.  Once he terminates on October 10th, he will not have
17 any further contact with our office.
18            THE COURT:  Yes.  So that's exactly what I was hoping
19 I would not hear, what you are saying.
20            P.O. GONZALEZ:  He is not on supervision anymore.  The
21 supervision term has to end at some point.
22            THE COURT:  I think I understand that concept very
23 well.
24            But I'll say it again, in many contexts, in many
25 places, you don't just end.  Whether it is in supervised

J9hdricc

release or in counseling or in therapy or in medicine, the field of medicine, it's preferable that there be some sort of termination and post-termination plan developed between the person supervised and the former supervisor.

I take it that is not happening in this case?

P.O. GONZALEZ: No. I don't know that that happens in any of our cases.

THE COURT: Oh, really?

P.O. GONZALEZ: No, sir. Like I said, we work --

THE COURT: Don't talk about everybody. Talk about yourself. I take it it is not happening in your -- in this case; is that right?

P.O. GONZALEZ: No, your Honor. When somebody gets to the termination date, there is no further contact with the Probation Office. Mr. Richmond has been on supervision for a total of five years almost consecutively now. So, no, there is no contact after the termination date. That's --

THE COURT: That's my concern, yes.

P.O. GONZALEZ: We have no ability to enforce anything --

THE COURT: I understand. I get it. I get it.

P.O. GONZALEZ: We have no jurisdiction over him.

THE COURT: You have no jurisdiction --

P.O. GONZALEZ: So, I mean, our hands are tied. There is nothing we can do.

1                THE COURT:  Oh, really?

2                P.O. GONZALEZ:  Certainly.  I could tell him anything
3     and he could say "No thanks" and "OK."

4                THE COURT:  But in point of fact, you didn't tell him
5     anything?

6                P.O. GONZALEZ:  Again, we've been working on a
7     post-supervision plan since the day he started.

8                THE COURT:  And what is that plan?

9                P.O. GONZALEZ:  So to get a job, legitimate, gainful
10    employment that puts him in a position where he is
11    self-sufficient and productive, to live an honest, law-abiding
12    life, to contribute to his family and his community.  That's
13    all --

14               THE COURT:  That's the plan?

15               P.O. GONZALEZ:  Yeah, that's the plan.

16               THE COURT:  All right.  OK.  Yeah, I get it.  I am
17    disappointed but I get it.

18               P.O. GONZALEZ:  OK.

19               MR. NEFF:  Your Honor, if I may.  I'm sorry?

20               THE COURT:  Yes.

21               MR. NEFF:  If it is useful, the Probation Officer
22    mentioned that the supervisee has not come in for the last two
23    appointments, but she is certainly willing and able to meet
24    with him one final time and, in essence, talk about the future
25    hopes, plans, resources and the like.  That may not be exactly

1    what the Court has in mind --

2             THE COURT:  It's something.  It certainly would be
3    something.

4             MR. NEFF:  It is a forward-looking conversation about
5    goals and the like that may, within the jurisdictional
6    limitations, achieve some of the goals the Court is pointing
7    out.

8             THE COURT:  I think that would be helpful.  I think
9    that's vastly different than a supervisee who didn't show,
10   let's say, the last two times or more -- and I'm not saying --
11   I'm not ascribing blame here because it takes two to have a
12   meeting, but in the absence of what you're suggesting, you
13   realize from my point of view that it is like falling off a
14   cliff and in my opinion for someone who could use -- it may be
15   difficult to accept and to present, but someone who could use
16   some further guidance or suggestions or resources or you could
17   go to this place if you needed to go to therapy or you could go
18   to this place if you are looking for employment or, you know.
19   That's really what I'm looking for.

20            Yes?

21            MR. NEFF:  That makes sense, your Honor, and the
22   Officer will seek to schedule that appointment with the
23   supervisee.

24            THE COURT:  OK.  So on October 7 we'll have one more
25   session at 10, and we'll hear that transpired; that would be

1    helpful.  We'll also hear if the restitution has been made.
2    And if everybody is in agreement, that supervision terminate on
3    October 10, or whatever the date is.
4              MR. RUDDY:  That works for us, your Honor.  Thank you.
5              THE COURT:  Great.  Anybody have --
6              P.O. GONZALEZ:  Your Honor, I'm not available on the
7    7th.  Could we make it the 4th, maybe?
8              THE COURT:  I would like it to be close to the 10th.
9              P.O. GONZALEZ:  The 8th or the 9th.  I am just not
10   available on the 7th.
11             (Pause)
12             THE COURT:  I could do October 8 at noon.
13             MR. RUDDY:  That works for the defense, your Honor.
14             P.O. GONZALEZ:  Thank you, your Honor.
15             THE COURT:  Great.  Good to see you all.
16             MR. RUDDY:  Thank you very much, your Honor.
17             MR. NEFF:  Thank you, Judge.
18             THE COURT:  So I think how you end is as important in
19   many instances as how you begin.  So maybe we could have a
20   little bit of an uptick toward the end, and I think the
21   suggestions that have been made here will go some degree toward
22   accomplishing that goal.  Thanks a lot.
23             MR. RUDDY:  Thank you, your Honor.
24             MR. NEFF:  Thank you, your Honor Judge.
25             (Adjourned)